AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) |
| Christopher Froehlich | ) |
| | ) |
| | ) |
| | ) |

Case No.

8:22MJ1699AAS

_Defendant(s)_

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____July 14, 2022_____ in the county of _____Hillsborough_____ in the

____Middle____ District of _____Florida_____ , the defendant(s) violated:

| _Code Section_ | _Offense Description_ |
|---|---|
| 18 U.S.C. §§ 2251(A), 2252(a)(2), and 2252(a)(4) | Production, distribution, and possession of child pornography. |

This criminal complaint is based on these facts:

See affidavit

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Loretta Bush, SA, FBI
_Printed name and title_

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d)

Date:   July 14, 2022

_____
_Judge's signature_

City and state:           Tampa, FL

AMANDA A. SANSONE, U.S. Magistrate Judge
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF
## SEARCH WARRANTS AND CRIMINAL COMPLAINT

I, Loretta Bush, being sworn to tell the truth, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since May 2016. I am presently assigned to the Tampa Division's Sarasota Resident Agency's Child Exploitation and Human Trafficking Task Force. In this capacity, I am responsible for conducting criminal investigations of statutes contained in Title 18 of the United States Code, including crimes related to child sex trafficking, child pornography and the sexual exploitation of children, among other violations of federal law.

2.      From March 2021 to the present, I have worked crimes against children violations in the Tampa Division. I have participated in investigations of persons suspected of violating federal child pornography and child sex trafficking laws, including 18 U.S.C. §§ 2251, 2252, 2422, and 1591. These investigations have included the use of surveillance techniques, the interviewing of subjects and witnesses, and the planning and execution of arrest, search, and seizure warrants. In the course of these investigations, I have reviewed images and videos containing child pornography and images depicting minor children engaged in sexually explicit conduct on various forms of electronic media including computers, digital cameras, and wireless telephones, and have discussed and reviewed these materials with other law enforcement officers. I have also received and provided training on crimes against children matters at various conferences and venues.

3.     This affidavit is submitted in support of the following:

a.     A search warrant for the person of Christopher Froehlich ("**FROEHLICH**"), as described in Attachment A-1;

b.     A search warrant for 902 S. 8th Avenue, Wauchula, Florida, 33873 ("**TARGET RESIDENCE**"); as described in Attachment A-2; and

c.     An application for a criminal complaint and arrest warrant for **FROEHLICH**.

d.     As set forth in more detail below, there is probable cause to believe that **FROEHLICH** has violated 18 U.S.C. §§ 2251(A), (production of child pornography), 2252(a)(2) (distribution of child pornography), and 2252(a)(4) (possession of child pornography) (collectively, the "Target Offenses"). Additionally, there is probable cause to believe that **FROEHLICH** and the **TARGET RESIDENCE** contain the fruits, instrumentalities, and/or evidence of the Target Offenses.

4.     As further discussed below, **FROEHLICH** used a computer or cellular phone, which was connected to the Internet, a facility of interstate or foreign commerce, to knowingly receive child pornography, to persuade or induce a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction, and to entice the minor to engage in sexual activity.

5.     The facts contained in this affidavit are drawn from personal knowledge based on my participation in this investigation, information from other criminal investigators, information from law-enforcement officers, information from agency

2

reports, and the review of documents provided to me by witnesses and by law enforcement officers. Because this affidavit is being submitted for the limited purpose of obtaining a criminal complaint and arrest warrant for **FROEHLICH** and seeking authorization to search **FROEHLICH** and **TARGET RESIDENCE**, I have not set forth each and every fact learned during the course of this investigation.

## DEFINITIONS

6.      The following definitions apply to this Affidavit and Attachment B-1 and B-2:

a.      The term "minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of 18.

b.      "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short to enable other participants to respond quickly in a format that resembles an oral conversation. This feature distinguishes "chatting" from other text-based online communications, such as, internet forums and email.

c.      "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors in sexually explicit poses or positions.

d.      "Child Pornography," as used herein, is defined in 18 U.S.C. § 2256(8) to include any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually

explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct.

e.     "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means that are capable of conversion into a visual image. *See* 18 U.S.C. § 2256(5).

f.     "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. *See* 18 U.S.C. § 2256(2).

g.     "Computer passwords and data security devices," as used herein, consists of information or items designed to restrict access to or to hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (*i.e.*, a string of alphanumeric and/or other characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security

4

functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

h.     "Fingerprint sensor-enabled device" refers to the automated method of verifying a match between two human fingerprints. Fingerprints are one of many forms of biometrics used to identify individuals and to verify their identity.

i.     "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, electronic mail ("email"), remote storage, and co-location of computers and other communications equipment.

j.     "Mobile applications," as used herein, are specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including, such as, engaging in online chat, reading a book, or playing a game.

k.     "Remote Computing Service" ("RCS"), as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

## BACKGROUND ON COMPUTERS, CELLPHONES, AND CHILD PORNOGRAPHY

7.     Computer technology has revolutionized the way in which individuals interested in child pornography interact with each other. Child pornography was once produced using cameras and film (either still photography or movies). The

5

photographs required darkroom facilities and a significant amount of skill in order to develop and to reproduce the images. There were definable costs involved with the production of pornographic images. Consequently, distributing such media on any scale required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. Distribution, accordingly, was accomplished through a combination of personal contacts, mailings, and telephone calls. The development of computers has changed this. Now, computers serve multiple functions in connection with child pornography, including, principally: production, communication, distribution, and storage.

8.     Child pornographers can now transfer photographs onto a computer-readable format with a scanner. With the advent of digital cameras, they can now also transfer such images directly onto a computer. A device known as a modem allows any computer to connect to another computer by telephone, cable, or wireless connection. Such electronic contact can connect literally millions of computers around the world.

9.     The computer's and cellphone's ability to store images in digital form makes the computer, itself, an ideal repository for child pornography. Within the last decade, the size of the electronic storage media, commonly known as a hard drive, on home computers has grown tremendously. Consequently, hard drives can now easily store thousands of images at very high resolution.

10.     The Internet affords collectors of child pornography several different venues to obtain, view, and/or trade child pornography in a relatively secure and anonymous fashion.

11.     Collectors and distributors of child pornography also use online resources to retrieve and to store child pornography, including services offered by Internet Portals such as Google, Yahoo!, and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides email services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Often, evidence of such online storage of child pornography is also found on the user's computer. Even in cases where online storage is used, however, evidence of child pornography can still be found on the user's computer in most cases.

12.     Digital files, such as, movies and pictures, can also be easily transferred between computers, smart phones, and other devices, or stored simultaneously on multiple devices. Collectors of child pornography often keep their child pornography in multiple places, including on multiple devices.

13.     As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (*e.g.*, by saving an e-mail as a file on the computer or by saving the location of one's favorite websites in, for example, "bookmarked" files). Digital information can also be unintentionally retained (*e.g.*, traces of a path of an electronic communication may be automatically stored in many places, such as, in temporary files or ISP client software). In addition to electronic communications, a computer user's activities on the Internet generally leave traces, "footprints," and/or history files of the browser used. A forensic examiner often can recover evidence

7

suggesting whether a computer contains wireless software, whether it was using Yahoo! Messenger, and when certain files under investigation were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data.

14.    Cellular phones and cellular phone technology have further revolutionized the way in which individuals interested in child pornography interact with each other. Today's cellular phones, many of which are called "smart phones," are typically capable of storing a wide variety of data.  Such data includes not only telephone numbers, contact lists, addresses, voicemails, and/or text messages, but also images, videos, documents, and programs (often referred to as "applications" or "apps") in much the same way a desktop or laptop computer does.

15.    Data can also be stored on a cellular phone, particularly when it has a high-storage capacity, just like a computer. The storage capacity for a cellular phone includes both internal and removable digital memory. Today's cellular phones can offer up to 128 gigabytes of storage, or more. Removable memory storage can significantly increase, if not double, that storage capacity. As a result, cellular phones can store thousands of high-resolution images and videos. Further, the phones have the ability to be synced with, or connected to, a computer, which allows the user to transfer files between the devices.

16.    Cellular phones are also typically able to access the Internet through either a wireless data plan and/or through a wireless (also known as "wi-fi") Internet connection.  This allows cellular phone users to perform many Internet functions on

their phones, such as, downloading and uploading data (*e.g.*, images, videos) from the Internet, sending and receiving emails, accessing web pages, browsing the Internet, using instant messaging services, and conducting live video chat. Consequently, cellular phones—given their ability to access the Internet and to download images and/or videos onto its internal and removable digital memory—are ideal repositories for child pornography, just like computers, and provide child pornographers with an additional method to share and to trade their child pornography collections.

17.     Cellular phones can also take pictures or "images," which are stored as image files, such as, "JPEGs" or "TIFFs." Image files often contain Exchangeable Image File Format ("EXIF") data.  EXIF data can include a variety of information about the image, including, for example, the time and date that the image was taken, the place where an image was taken (also known as "geolocation data"), the settings that the device used to capture the image, the model of the camera phone that was used to take the image, the focal length of the lens, aperture settings, shutter speed, and ISO speed.

## PROBABLE CAUSE

18.     On or about April 6, 2022, the FBI received information that **VICTIM**, who is 19 years old, had been sexually exploited by an individual online since **VICTIM** was 15 years old. **VICTIM** initially believed the individual online to be a child, but the individual online was in fact an adult. As detailed herein, investigation

9

has revealed that the individual online is **FROEHLICH**, who resides in the Middle District of Florida.

19.     **VICTIM** provided the following information related to her online relationship with an individual **VICTIM** knew as "Kevin White" ("**WHITE**"). On or about December 2017, **VICTIM** was 15 years old and in the ninth grade. **VICTIM** described herself as being a lonely kid and looking for attention. **VICTIM** decided to begin using an Internet live-streaming application called LIVE.ME. **VICTIM** would publicly live stream herself after school, while doing her homework or playing video games, in the hopes of having individuals hang out with her virtually. **VICTIM**'s biography on LIVE.ME included her actual age, 15, and detailed that she was a freshman in high school.

20.     **VICTIM** did not have a lot of followers, but she noticed one of her followers was watching her live streams multiple days in a row, and that this follower would start watching her stream almost immediately after she began. **VICTIM** believed this follower had notifications set up to alert the follower when **VICTIM** began live streaming.

21.     **VICTIM** explained that there was a chat feature that would allow live viewers to talk to **VICTIM**. **VICTIM** began chatting with this follower because she was intrigued by the user's screen name, "time_of_lonely." The user identified himself as **WHITE** to the **VICTIM**. **VICTIM** and **WHITE** began exchanging photos of themselves.

22.    After about two weeks of talking with **WHITE**, **VICTIM** believed the following to be true about the individual:

> Name: Kevin White
> DOB: September 11, 2002
> Age: 15
> Location: Wauchula, Florida
> High School: Hardee High School
> Mother's Name: Brenda White
> Father's Name: James White
> Sister's Name: Destiny White
> Best Friend: Jimmy Last Name Unknown (LNU)

23.    **WHITE** also told **VICTIM** that he played baseball, his family was wealthy, he was skilled at working with people with seizures, and that his sister, Destiny White, had died from a seizure. **VICTIM** described **WHITE** as having a southern accent. **VICTIM** also knew **WHITE**'s interests to include, WWE wrestling, Batman, Horror films/Michael Myers movies, 80's Rock music, and Rob Zombie films.

24.    **WHITE** asked **VICTIM** to be his girlfriend on or about December 2017. Once **VICTIM** and **WHITE** began dating, they moved their communication to Snapchat, Instagram, phone calls, and FaceTime video calls (Apple's video-calling feature). **WHITE** would "love bomb" **VICTIM**. **VICTIM** described "love bombing" as **WHITE** overwhelming her with loving words, actions, and behavior. **WHITE** would tell her she was pretty and pay her attention. **VICTIM** explained that the two of them would stay up late at night and talk on the phone.

11

25.    **VICTIM** provided the following usernames, phone numbers and last dates of contact for **WHITE**:

    a.  Snapchat: ghosthunter2889 (December 2017 through July 10, 2020)

    b.  Instagram: time_of_lonely (December 2017 through July 10, 2020)

    c.  Phone Number: 863-XXX-5870 (December 2017 through September 16, 2018)

    d.  Phone Number: 863-XXX-1963 (September 2018 through July 10, 2020)

26.    According to **VICTIM**, **VICTIM** and **WHITE** had been in a relationship for approximately one week when **WHITE** first asked **VICTIM** for nude pictures of herself. The first nude picture **VICTIM** sent **WHITE** was Christmas-themed and depicted **VICTIM** with her bare breasts exposed and wrapping paper around her nude bottom. **VICTIM** stated that she noticed that this made **WHITE** happy so she sent **WHITE** nude pictures every day because she wanted to keep him happy and thought that doing this would prevent **WHITE** from leaving or breaking up with her.

27.    According to the **VICTIM**, **WHITE** also requested **VICTIM** to masturbate during live video chats on FaceTime. Initially, **VICTIM** refused, but **WHITE** became persistent and aggressive and she complied. **VICTIM** never saw **WHITE** during the video calls. **WHITE** would say that his camera was broken, or that **VICTIM** would see him soon. **VICTIM** explained that **WHITE**'s camera on the backside of his phone did work because she was able to see the table the phone was set

up on or the room **WHITE** was in. Despite never seeing **WHITE**, **VICTIM** masturbated for **WHITE** on the video calls.

28.    **VICTIM** knew **WHITE** took screenshots of her during the live video calls because she could hear the screen capture. Additionally, **WHITE** sent **VICTIM** an image of **VICTIM** masturbating with a dildo, that she recognized to be from one of their live video calls.

29.    **VICTIM** provided me screen captures of the following text messages received from **WHITE** using telephone number (863) XXX-5870:

    a.  12/28/17: An nude

    b.  1/5/18: You do know that I will never post your nude, right?

    c.  1/9/18: When you can, go look! I post two nudes of you !

    d.  2/5/18: I'm posting a nude on Instagram

    e.  2/18/18: Oh your nudes: I'm posting them now

    f.  2/18/18: Well you don't have me anymore bye now to post your nudes

    g.  2/27/18: Wanted nudes out of you

30.    **VICTIM** also recalled that on multiple occasions **WHITE**, using Instagram username "time_of_lonley," posted a Child Sexual Abuse Material (CSAM) image of **VICTIM** to Instagram. **VICTIM** remembers that **WHITE** posted a screenshot from her live video calls that depicted **VICTIM** approximately 15 to 16 years old masturbating with a dildo. **VICTIM'S** face is visible in the image—which image is detailed above.

31.    Subpoena response from Sprint/T-Mobile for telephone number (863) XXX-5870 provided the following information:

   a.   Account Establish Date: 7/20/2016

   b.  Account Expiration (Cancel) Date: 2/20/2021

   c.  Account Billing Address(es): Effective: 9/13/2017, 1017 S. 9th Avenue, Wauchula, FL 33873.

32.    **VICTIM** provided me screen captures of the following excerpted text messages received from **WHITE** using telephone number (863) XXX-1963:

   a.  7/27/18:

> WHITE: Can you do something since your home alone?
>
> VICTIM: Maybe
>
> WHITE: Do a broadcast
>
> VICTIM: After I get dressed
>
> WHITE: No do it nude
>
> VICTIM: No
>
> WHITE: But you got a sexy body
>
> VICTIM: It's only for you though (kiss face emoji)

   b.  7/29/18:

> WHITE: Ok I'm posting you sexy pics
>
> VICTIM: Why?
>
> WHITE: So you'll be famous when school stats back
>
> VICTIM: Go die

14

WHITE: You first

WHITE: Should I post Wonder Women or the bunny pics?

VICTIM: Go die

WHITE: I'm letting you pick

VICTIM: How about I leave you?

WHITE: Can you just answer me?

VICTIM: Die

WHITE: Ok then I'll pick

WHITE: Or the stripper video?

WHITE: Maybe all of them?

c. 12/16/18:

WHITE: Put clothes pins on your nipples

VICTIM: Mm

VICTIM: Tree time

WHITE: Mhmm I want nudes of you in front of it (wink face emoji)

VICTIM: OMG (eyes covered emoji)

WHITE: That be sexy

VICTIM: You're too much for me

d. 12/28/18:

WHITE: Look up nude girls an get horny for me

WHITE: Touch yourself

15

VICTIM: Yo tho

VICTIM: Y tho

WHITE: To get horny so we can do it

VICTIM: Quietly?

WHITE: Guess so

VICTIM: Mkay

WHITE: You won't

e. 7/13/2019:

WHITE: K want to be a fucking slut? I'll post all your nudes!!

WHITE: Fucking answer

WHITE: Answer

f. 7/13/2019:

WHITE: Answer

WHITE: Right now!$

WHITE: I'm about to post your nudes

WHITE: I swear to god you little slut!!

WHITE: Oh you blocked me for him (three heart faced emojis) aww your nudes are getting posted now

WHITE: I'll give you one last chance to answer then I'll post your nude an tag all your friends in it!!

WHITE: Ok here comes your nudes

WHITE: You little fucking slut!

16

WHITE: OK first one up should I keep going?

WHITE: Ok another nude

WHITE: Every time you don't answer is a new nude to be posted

WHITE: Already got 2 nudes up!

33.     Sprint/T-Mobile and AT&T provided records related to telephone number (863) XXX-1963.

34.     A subpoena response from Sprint/T-Mobile for telephone number (863) XXX-1963 provided the following information:

    a.   Account Establish Date: 7/18/2018

    b.   Account Expiration (Cancel) Date: 1/9/2022

    c.   Account Billing Address(es): Effective: 7/22/2018, Chris Kemp, P.O. Box 15955, Lenexa, KS 66285

35.     A subpoena response from AT&T for telephone number (863) XXX-1963 provided the following information:

    a.   Service Start Date: 02/05/2020

    b.   Active: 02/05/2020 - 06/30/2020

    c.   Name: Christopher Froehlich

    d.   User Address: 1017 S. 9th Avenue, Wauchula, FL 33873

36.     A subpoena response from Sprint/T-Mobile for telephone number (863) XXX-1963 provided the following information:

    a.   Account Establish Date: 6/30/2020

    b.   Account Expiration (Cancel) Date: 3/9/2022

c.   Account Billing Address(es): Effective: 6/30/2020, Chris Froehlich, 250 Maxwell Drive, Wauchula, FL 33873

37.   Through the subpoena results, I confirmed **FROEHLICH** switched his cell phone service provider from Sprint/T-Mobile to AT&T on or about June 30, 2022.

38.   **VICTIM** stated that in exchange for her pornographic pictures, **VICTIM** received pictures from **WHITE** of a young boy who appeared to be around the same age as **VICTIM**. Most of these pictures were clothed, but **WHITE** sent two images that depicted nudity; the first picture depicted a nude male from the neck down standing in a mirror, and the second picture depicted a male from the chest down to his mid-thigh wearing only blue boxer briefs that were loose.

39.   After approximately three to four months of dating, **VICTIM** stated she could tell that **WHITE** was becoming more comfortable based on the personal information and beliefs he started sharing with her. **VICTIM** described **WHITE** as being racist, homophobic, and transphobic. **WHITE** would make racists comments like "black people are not real people" and use the "N-word" when referring to black people.

40.   Around the same time, **VICTIM** tried providing **WHITE** with fewer nude photographs and live masturbation videos. In response, **WHITE** demanded **VICTIM** continue sending the Child Sexual Abuse Material (CSAM) or he would leave her. **VICTIM**, who had become more distanced from her friends and family due

to this relationship, felt she had no choice but to continue to send the nude pictures and videos to **WHITE**.

41.     **VICTIM** stated that if too much time passed where **VICTIM** didn't send **WHITE** any nude pictures or videos, **WHITE** would demand **VICTIM** send a nude by texting "do it now!" This happened several different times on different dates while **VICTIM** was at school. On one occasion, **VICTIM** recalls that she texted **WHITE** explaining she was in English class and unable to produce the nude picture, at which point **WHITE** instructed **VICTIM** to go to the bathroom and produce the picture. **VICTIM** did not send the photo.

42.     **VICTIM** recalls that as she attempted to stop sending **WHITE** nude pictures, the two fought and the fights got progressively worse. **WHITE** threatened to post nude pictures of **VICTIM** across various social media platforms if **VICTIM** stopped producing and sending new images to **WHITE**. Based on the threats, **VICTIM** continued to produce more nude pictures of herself for **WHITE**.

43.     **VICTIM** felt **WHITE** was completely controlling **VICTIM**'s life. **WHITE** demanded live video calls daily and forced **VICTIM** to masturbate during those calls. **WHITE** also instructed **VICTIM** that she was not allowed to leave her phone. If **VICTIM** did not respond to **WHITE** quickly, **WHITE** threatened to post nude images of **VICTIM** to social media and, in some instances, actually did so.

44.     **WHITE** often insisted **VICTIM** wear specific outfits for their video calls or the photos she was taking, such as schoolgirl outfits, superhero outfits, or lingerie.

45.    On multiple occasions, **WHITE** demanded **VICTIM** insert various inanimate objects into her vagina. **VICTIM** inserted a ping pong ball into her vagina based on **WHITE**'s demand.

46.    On multiple occasions, **WHITE** told **VICTIM** to insert a foreign object into her butt. **VICTIM** explained that she attempted to do so at one point, but it hurt and she did not follow through.

47.    **WHITE** demanded **VICTIM** produce images depicting bondage, such as **VICTIM** tying herself up or handcuffing herself to her bed. Additionally, **WHITE** demanded **VICTIM** produce images depicting bestiality with **VICTIM**'s dog or he would post nude pictures of **VICTIM** to social media. **VICTIM** did not produce bondage or bestiality images for **WHITE**.

48.    In or about June 2020, **VICTIM** stated that she still cared for **WHITE** but she began to try to find a way out of the relationship.

49.    **VICTIM** explained that no one really knew what had been happening in the relationship. **VICTIM** kept everything to herself and began to feel extremely isolated.

50.    In or about July 2020, **VICTIM** started to listen to her suspicions about **WHITE** and conducted a reverse image search using the two nude pictures that he had sent to her. **VICTIM** discovered that both pictures detailed above were taken from Internet websites.

51.     **VICTIM** used the internet to reverse search **WHITE**'s phone number, 863-XXX-1963. The search results revealed an individual by the name of Chris Froehlich **(FROEHLICH)**.

52.     After learning **FROEHLICH**'s name, **VICTIM** recalled two separate incidents involving the name "Chris". **VICTIM** described the incidents as follows:

a.   On March 13, 2018, **VICTIM** received a message from an Apple user with the email address bigchris606@gmail.com. The message exchange between **VICTIM** and the user reads as follows:

bigchris606@gmail.com: I love you more!!

bigchris606@gmail.com: Cause you're my princess!!

**VICTIM**: Kevin?

bigchris606@gmail.com: What?

**VICTIM**: Who the fuck is big Chris

bigchris606@gmail.com: Idk my glitched

**VICTIM**: No

bigchris606@gmail.com: It just came back on

**VICTIM**: bigchris606@gmail.com

bigchris606@gmail.com: Oshkosh

bigchris606@gmail.com: Idk

**VICTIM**: Hon you're messaging me from it

**VICTIM**: I'm not fucking stupid

bigchris606@gmail.com: The iPad I just got in the mail

    b. Additionally, on June 2, 2020, **VICTIM** missed two Facetime calls from bigchris606@gmail.com.

53.    **VICTIM** explained it was at this time, in June 2020, that she began to realize that **WHITE** was not who she thought he was. **VICTIM** continued to search the Internet for any other social media accounts related to **FROEHLICH**.

54.    A subpoena response from Google for the account bigchris606@gmail.com provided the following information:

    a. Google Account ID: 981664587938

    b. Name: Chris Kemp

    c. Created on: 2011-02-27 05:07:27 Z

    d. Last Logins: 2022-06-02 11:49:52 Z

    e. Recovery e-Mail: wwenxt1981@yahoo.com

    f. Recovery SMS: +1863XXX4575 [US]

    g. Login IP address: 2022-06-02 71.215.76.77; 2022-05-15 71.1.233.98

55.    A subpoena response from Yahoo! for the email address wwenxt1981@yahoo.com provided the following information:

    a. Mail Name: wwenxt1981@yahoo.com

    b. Account Status: active

    c. Registration IP Address: 66.87.107.233

    d. Registration Date: 2015-01-20T17:48:28.000Z

e. Full Name: chris kemp

f. Recovery Phones: +1863XXX7118 Verified

56. A subpoena response from AT&T for telephone number (863) XXX-4575 provided the following information:

a. Active: 03/09/2022 - Current

b. Name: Christopher Froehlich

c. User Address: 1017 S. 9th Avenue, Wauchula, FL 33873

d. Service Start Date: 03/09/2022

57. **VICTIM** found a Facebook account with the username, "Chris **FROEHLICH**." **VICTIM** noticed the majority of the information that **VICTIM** believed to be true about **WHITE** was listed on "Chris **FROEHLICH**'s" Facebook page. This information included the following: **FROEHLICH** lived in Wauchula, FL and had attended the same Florida high school **WHITE** claimed to attend Hardee High School. Additionally, his father's name was James, his mother's name was Brenda, and he had an interest in WWE wrestling. **VICTIM** also noticed that the way **FROEHLICH** wrote his posts was similar in style to the way **WHITE** would post on his Instagram page with the username "time_of_lonely." **VICTIM** realized the major difference between **WHITE** and **FROEHLICH** was their ages; **WHITE** was 15 years old and **FROEHLICH**, based on the information on his Facebook page, appeared to be approximately 40 years old.

58.    A subpoena response from Meta for the Facebook account 100011876886163 provided the following information:

   a.  Account Identifier 100011876886163

   b.  Name: Chris Froehlich

   c.  Registered Email Addresses: kempchris745@yahoo.com

   d.  Registration Date 2016-04-17 22:12:17 UTC

   e.  Registration Ip 66.87.122.250

   f.  Logins IP Address: 71.1.233.98 /Time 2022-03-12 05:03:00 UTC

59.    On or about July 10, 2020, **VICTIM** blocked all the social media accounts that she knew to be associated with **WHITE**.

60.    After July 2020, **VICTIM** explained that she felt awful because of this experience. **VICTIM** had lost all her friends and she was isolated because of the COVID-19 pandemic. The individual she believed to be **WHITE**, and who she had dated for approximately two years, continued to reach out to **VICTIM**, requesting to talk to her. **VICTIM** declined.

61.    **VICTIM** kept her phone number the same. One day, shortly after **WHITE** and **VICTIM** broke up, in approximately mid to late 2020, **VICTIM** noticed that something was wrong with her phone service. **VICTIM'S** friends began notifying her that they were receiving out-of-character messages from **VICTIM**. **VICTIM** believes that her Boost Mobile account was hacked by **WHITE** or someone associated with him. **VICTIM** subsequently changed her number.

62.   In or about late 2020 to early 2021, **VICTIM** began receiving friend requests, and direct messages from various users on multiple social media platforms. The users had notable similarities to **WHITE**. Some of the users would have the same profile picture as **WHITE** while others posted that they had the same interests as **WHITE**. Additionally, the content of the messages was similar to the way **WHITE** interacted with **VICTIM**. As a result, **VICTIM** believes that all the users were **WHITE**.

63.   **VICTIM** also received multiple phone calls and text messages within minutes of each other from various phone numbers. The text conversations would continue fluidly, despite the phone numbers changing. Based on the totality of the circumstances, **VICTIM** believed this to be **WHITE** using Voice Over Internet Protocol numbers. The text conversations read as follows:

a.  3:33 PM: (816) XXX-0739: Damn you block me already

b.  3:40 PM: (816) XXX-0861: Just please give me a chance

c.  4:03 PM: (816) XXX-9610: I changed [**VICTIM**]

64.   In addition to **VICTIM** being contacted, **VICTIM**'s friends, boyfriend and boyfriend's family began to receive pictures of **VICTIM** via direct messages on Facebook and Instagram. One picture depicted **VICTIM**, nude and hugging her dog. **VICTIM** knew that **WHITE** possessed this picture of **VICTIM** as it was a screen capture taken during one of their live video calls.

65.    On or about August 7, 2021, Instagram user "The_ill_pickle" messaged **VICTIM**. The messages read as follows (times are noted in Central Daylight Time "CDT"):

    a. 7:07 PM: The_ill_pickle: I think [XXXX] fucked you enough.. I'll give till 9:00 my time to text me or I'm going after his rican family.

    b. The_ill_pickle: I already go a fake Instagram ready with most of his friends and family. Time counting down

    c. The_ill_pickle: Don't try to be brave bitch cause you know I'll do it!

    d. The_ill_pickle: Almost show time

    e. 8:52 PM: The_ill_pickle: ... Unless you send me a video of y'll fucking!

    f. 8:53 PM: The_ill_pickle: I'll give you 5 minutes to send it then I'll go back and send shit to them afain

    g. 8:55 PM: The_ill_pickle: I'll send videos to your sister also

    h. 9:00 PM: The_ill_pickle: You may change your settings like your pussy ass rican boyfriend, but got all his families name. Js

    i. 9:02 PM: The_ill_pickle: All it takes is a video of you fucking him for me to stop and be gone forever

    j. 9:05 PM: The_ill_pickle: You brave little bitch! I'll ruin you and thar fuck boy!

    k. 9:05 PM: The_ill_pickle: So be smart and send a video and I'll be gone forever

    l. 9:06 PM: The_ill_pickle: Ok fuck it I'll start send then request again

m. 9:07 PM: The_ill_pickle: You could of stopped this but you had to be a brave little bitch

66.  A subpoena response from Meta for the Instagram account "The_ill_pickle" provided the following information:

a.  Registered Email Address: bigchris606@gmail.com

b.  Registration Date: 2021-03-06 03:20:11 UTC

c.  Registration Ip: 71.208.107.120

d.  Account Still Active: True

e.  Logins IP Address: 71.215.76.77 Time 2022-06-08 22:48:43 UTC; 71.1.233.98 Time 2022-05-16 00:56:01 UTC

67.  On Friday, June 3, 2022, **VICTIM** reactivated her Instagram. On June 4, 2022, **VICTIM**'s Pinterest account received direct messages from the username "lostsouless". **VICTIM** stated that this user had been messaging **VICTIM**'s Pinterest account since on or about March 17, 2022; however, she had not checked her messages. The user's profile picture was the Batman symbol. **VICTIM** received, but did not respond to, the following messages from "lostsouless":

a.  March 17: [**VICTIM**]

b.  April 7: [**VICTIM**]

c.  April 16: Still fucking the rican?

d.  April 24: 863-XXX-4575

e.  April 24: XXX

    f.  May 19: **[VICTIM]** text me please 863-XXX-4575

    g.  May 27: Can we talk yet so I can prove to you about everything

    h.  June 2: It's crazy next month will be 2yrs since my everything left

    i.  June 4: Yes you're instagram is up!

    j.  June 4: Now if you'll text me! 863-XXX-4575

    k.  June 4: 863-XXX-4575

    l.  June 4: 863-XXX-4575

    m. June 5: Put up a new pic so I can see what you look like now. Please?

    n.  June 6: (multiple heart emojis)

    o.  June 7: Least you didn't block me yet

68.    A Driver and Vehicle Information Database (DAVID) records check revealed **FROEHLICH**, has a date of birth of September 18, 1981 and lives at address: 1017 S. 9th Avenue, Wauchula, FL 33873.

69.    A utility database search for address 1017 S 9th Avenue, Wauchula, FL 33873 revealed that the utilities were registered in an unassociated individual's name on February 2, 2021.

70.    Subpoena response from Lumen Technologies provided the following information related to IP addresses 71.215.76.77 and 71.1.233.98:

    a.  Subscriber: Brenda Froehlich

    b.  Subscriber address: 902 S 8th Avenue, Wauchula, FL 33873 **(TARGET RESIDENCE)**

71.     I confirmed through the above-detailed investigation that **FROEHLICH** previously resided at 1017 S. 9th Avenue, Wauchula, FL 33873 but now lives at **TARGET RESIDENCE**.

72.     I confirmed with the United States Postal Services that as of June 2022, **FROEHLICH** is receiving mail at the **TARGET RESIDENCE**.

73.     On or about June 30, 2022, I conducted surveillance at the **TARGET RESIDENCE**. I observed **FROEHLICH** returning to the residence as a passenger in a silver in color, four door sedan. **FROEHLICH** exited the vehicle, retrieved shopping bags that appeared to have purchased items within them from the trunk of the vehicle, and then entered the residence.

74.     On or about July 5, 2022 to July 7, 2022, I conducted surveillance at the **TARGET RESIDENCE**. I observed **FROEHLICH** entering and exiting the **TARGET RESIDENCE**. At the end of each day, **FROEHLICH** remained inside the **TARGET RESIDENCE** until the next morning.

## CELLPHONE AND COMPUTER DATA

75.     As detailed above, there is probable cause to believe that **FROEHLICH** used a cellular device to produce and distribute child pornography, in violation of 18 U.S.C. §§ 2251(a) and 2252(a)(2), and that records and information will be stored on that device. There is also probable cause to believe **FROEHLICH** utilized the **TARGET RESIDENCE** to produce child pornography images and evidence of this crime will be located at this residence. Thus, the warrant applied for would authorize

the seizure of electronic devices, including cellphones, smartphones, and tablets under Federal Rule of Criminal Procedure 41(e)(2)(B).

76.     Based on my training and experience, I know that mobile devices are small, compact, and usually carried on an individual's person, or within stored within arm's reach inside a pocket, bag, backpack, fanny pack, briefcase, or suitcase.

77.     One place in which the records might be found is on a computer's hard drive or other storage media. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

78.     Based on my knowledge, training, and experience, and consultation with other law-enforcement agents, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in space on the storage medium that is not currently being used by an active file for long periods of time before they are overwritten, also known as free space or slack

space. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

79.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. It is technically possible, however, to delete this information.

80.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard-drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

81.     As further described in Attachment B-1, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

82.     Although some of the records called for by this warrant might be found in the form of user-generated documents (such as, word processor, picture, and movie

files), computer storage media can contain other forms of electronic evidence, such as, the following:

      a.     Forensic evidence of how computers were used, the purpose of their use, who used them, and when they were used, as described further in Attachment B-1, called for by this warrant. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

      b.     Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the

32

foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

        c.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs (and associated data) that are designed to eliminate data may be relevant to establishing the user's knowledge or intent.

## UNLOCKING MOBILE DEVICES USING BIOMETRIC DATA

83.    Many cellphones have the capability to be can be unlocked using biometric data, in particular, fingerprint and facial recognition technology. Accordingly, if a cellular device requires biometric data to unlock the device, I request that this Court authorize law enforcement officers to present **FROEHLICH's** fingerprints, face and irises to the device's cameras, screen, or fingerprint reader in an attempt to unlock the device for the purpose of executing the searches authorized by this warrant.

84.    Given their ability to store uniquely personal information, mobile devices are often protected by passwords, passcodes, or other security features, which generally enable only the primary user of the mobile device to use the mobile device and access the mobile device's functions and contents. I know from my training and experience, as well as from information found in publicly available online materials, that some models of Samsung devices offer their users the ability to unlock the device via the use of a fingerprint in lieu of a numeric or alphanumeric passcode or password. I am also

33

aware that some models of smart phone devices are equipped with technology that can use a scan of the user's iris or facial features to unlock the device. In my training and experience, users of devices that offer such features often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in child exploitation and thus have a heightened concern about securing the contents of the device.

85.    The passcode(s) or password(s) that would unlock the a cellular devices are not known to law enforcement officers. Thus, it will likely be necessary to hold the devices up to **FROEHLICH**'s face or press **FROEHLICH**'s fingers to the device's fingerprint sensors in an attempt to unlock the device for the purpose of executing the searches authorized by this warrant. Attempting to unlock the a devices using this biometric data is necessary because the United States may not otherwise be able to access the data contained on any devices for the purpose of executing the search authorized by this warrant.

86.    If **FROEHLICH** refuses to comply, I request that the Court authorize the law enforcement officers attempting to execute this warrant to employ a reasonable degree of force to compel **FROEHLICH**'s compliance.

34

## CONCLUSION

87.    Based on the above information, probable cause exists that **FROEHLICH** and **TARGET RESIDENCE**, as fully described in Attachments A-1 and A-2, contain evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. §§ 2251 and 2252, which criminalize possession, production, and distribution of child pornography. Accordingly, I respectfully request a warrant to search **FROEHLICH** and the **TARGET RESIDENCE** to seize the items listed in Attachments B-1 and B-2. There is also probable cause to believe that **FROEHLICH** committed the Target Offenses, and I respectfully request this Court to issue an arrest warrant for **FROEHLICH**.

Loretta Bush, Special Agent
Federal Bureau of Investigation


Affidavit submitted to me by reliable electronic means and attested to me as true and accurate by telephone or other reliable electronic means consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) before me this 14 day of July, 2022.

AMANDA A. SANSONE
United States Magistrate Judge

35